IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN BELL, | : | CIVIL ACTION NO. **3:CV-05-1134** |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Magistrate Judge Blewitt |
| | : | |
| MERICLE DEVELOPMENT CORP., | : | |
| et al., | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

## I. Background.

The Plaintiff, John Bell, originally filed this employment discrimination action on June 4, 2005, against sole Defendant Mericle Development Corp., pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, Count I, and the Family Medical Leave Act ("FMLA") 29 U.S.C. §§ 2601, *et seq.* (requires employers to allow an employee to take unpaid leave to care for his serious health condition and prohibits retaliation by employer for doing so), Count II. (Doc. 1). Defendant filed its Answer to the original Complaint on June 28, 2005. (Doc. 4). Subsequently, Plaintiff filed an Amended Complaint on November 21, 2005 (Doc. 12), in which he retained his two stated original claims and asserted two new counts under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. §§ 951, *et seq.*, one as against the original Defendant, and one against a new Defendant, Tina Rothery, a supervisor of Defendant Mericle. (Counts III & III (sic) of Amended Complaint, Doc. 12).[1]

---

[1]Plaintiff erroneously labeled his two separate PHRA claims in his Amended Complaint, Doc. 12, as "Count III," instead of Count III and Count IV.

On December 14, 2005, Defendant Mericle Development Corp. ("Defendant Mericle") filed a Motion to Dismiss the Plaintiff's Amended Complaint. (Doc. 15)[2]. Defendant argued that Plaintiff did not exhaust his administrative remedies with the PHRC before he filed this action, and thus his PHRA claims must be dismissed.   On January 31, 2006, we issued a Memorandum and Order denying Mericle's Motion to Dismiss, and directed both Defendants to file their responses to the Amended Complaint.[3] (Doc. 20).  Defendants Mericle and Rothery jointly filed their Answer to the Amended Complaint on February 10, 2006.  (Doc. 22).  Discovery then ensued.

On July 31, 2006, Defendants jointly filed a Motion for Summary Judgement.  **(Doc. 31)**. Also on July 31, 2006, Plaintiff filed a Motion for Partial Summary Judgment.  **(Doc. 32)**.  The Motions have been briefed by the parties, exhibits have been submitted, and Statements of Material Facts ("SMF") have been filed.  (Docs. 26-30, 33-35, 38-44).[4]  Both parties responded to each other's SMF.  (Docs. 32 & 39, 34 & 42).

Presently ripe for disposition are the Summary Judgment Motions of the parties.  (Docs. 31 & 32).  Defendants argue that they are entitled to summary judgment with respect to all counts of

---

[2]*See* Docs. 16, 17  & 19.
We noted that at the time Mericle  filed its Motion to Dismiss,   Defendant Tina Rothery had not  been served with the Amended Complaint and  she had  not yet responded to it. (Doc. 18).  Nor had  counsel entered an appearance on behalf of Rothery.  We also noted  that the  Motion to Dismiss was  filed only by original  Defendant Mericle, but it sought  to dismiss both new PHRA claims of the amended pleading, including the PHRA claim against Rothery.

[3]The parties have consented to proceed before the undersigned for all matters pursuant to 28 U.S.C. § 636(c). (Docs. 6, 7 & 8).

[4]Plaintiff attached his SMF to his Summary Judgment Motion.  (Doc. 32).

the Plaintiff's Amended Complaint since there is no genuine issue of material fact that Plaintiff's claims fail as a matter of law. Plaintiff argues that he suffered an illness at work, *i.e.* "seizure," on June 3, 2004, he was taken to the hospital by ambulance, he asked for leave due to his medical condition on June 14, 2004, and he was terminated and not given 12 weeks of FMLA. leave.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and § 1367(a).

## II. Motion for Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). An issue of fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A fact is "material" if proof of its existence or non-existence could affect the outcome of the action pursuant to the governing law. *Anderson*, 477 U.S. at 248. "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F. 3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994).

The burden of proving that there is no genuine issue of material fact is initially upon the movant. *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983). Upon such a showing, the burden shifts to the nonmoving party. *Id*. The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a

3

genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988). In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.*, quoting *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

Under Rule 56, summary judgment must be entered where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.  Allegations of the Amended Complaint.

The Plaintiff alleges that he began working for Defendant Mericle in October 2002 as a construction worker, that he is 30 years old, and that he has a seizure disability. Plaintiff avers that he suffered a seizure on June 3, 2004 and passed out while he was working for Defendant at a job site. Plaintiff was taken to the hospital by ambulance. Due to this condition, Plaintiff took the next day off of work. Plaintiff returned to work the following Monday, June 7, 2004, and informed his supervisor that he required time off to treat his medical condition. Defendants contacted him on this day to discuss his medical restrictions. Thereafter, Plaintiff had to leave work on June 10 and 11 for medical appointments and tests, and Defendants were aware of these appointments. On June 14, 2004, Plaintiff called off work due to a recurring headache since his June 3 seizure, and was then terminated. (Doc. 12, ¶'s 11.-22.).

4

Plaintiff also alleges that Defendants knew he had a disability, that he was significantly limited in major life functions due to his disability, and that he requested reasonable accommodation for time off for medical treatment, but Defendants refused to allow it. (*Id.*, ¶'s 23.-25.).  Thus, Plaintiff alleges that on June 14, 2004, he was terminated from his position due to his disability.

The Plaintiff avers  that he has filed a claim of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").  (*Id.*, ¶ 4. a.).  The EEOC issued a Notice of Right to Sue on May 31, 2005. (*Id.*, ¶ 4. b.).

In Counts I & III, Plaintiff  alleges that Defendant Mericle discriminated against him due to his medical condition and failed to accommodate him regarding his condition in violation of the ADA and the PHRA, respectively.  Also in Count III, Plaintiff alleges that Defendant Rothery aided and abetted the stated violations of the PHRA by Defendant Mericle.  In Count II, Plaintiff alleges that Defendant Mericle interfered with his rights under the FMLA and retaliated against him regarding his rights under the FMLA.

## IV.  Material Facts.

As stated, since both parties have flied their SMF and have responded to each other's SMF, we shall not repeat the SMF's that are admitted and shall incorporate them herein by reference. We first consider Plaintiff's SMF.

Plaintiff passed out at work on June 3, 2004, and was taken by ambulance to the Hazleton General Hospital.  The ER doctor at the hospital said to Plaintiff that he suffered a seizure.  Plaintiff

was given a CAT scan and a urine test.  Plaintiff left the hospital on June 3, 2004, against medical advice ("AMA").  (Doc. 41, Ex. 1).  The risk noted regarding Plaintiff's leaving the hospital AMA was "worsening seizure, collapse, stroke, etc."  Plaintiff was directed not to drive a car "for now."  Plaintiff's diagnosis was "seizure."  (*Id*.).

Subsequently, Plaintiff was seen by his doctor, Dr. Weinberger, and a neurologist after the June 3 incident. Plaintiff called off sick on June 14, 2004, by leaving a voice message on the phone of his supervisor, Joe Powles.  Plaintiff only called off for that day.  (Docs. 33 & 42, Plaintiff deposition, NT 113-114, 69).  Plaintiff did not specifically ask for FMLA leave on June 14.  (*Id*., NT 127).  Plaintiff was terminated on June 14, 2004, eleven (11) days after he passed out at work and was taken to the hospital by ambulance.

The following SMF's of Defendants are admitted by Plaintiff (Docs. 34 & 42):[5]

¶ 1; ¶'s 3-5; ¶'s 6-9, Plaintiff performed a variety of tasks as a laborer and any day he could be assigned to do any tasks, including grade trenches with stone, use hand tools, use a backhoe, and manually connect pipes in trenches and use a whacker to compact the trenches; ¶ 10; ¶ 12, Plaintiff used a trench loader, rock truck and backhoe; ¶ 13, Joe Powles was Plaintiff's supervisor with the excavating division during both of Plaintiff's terms of employment with Mericle; ¶ 14, Plaintiff does not recall why he left Mericle during his first term of employment in 2002; ¶'s 16-22; ¶ 23, Plaintiff had three (3) discretionary/sick days per year during his second term of employment with Mericle; ¶ 24; ¶'s 25-27, Plaintiff experienced headaches during both terms of his

---

[5]We shall only state the facts that are admitted in part to the extent that the parties agree to them.  We shall not repeat the facts that are admitted in toto by Plaintiff.

employment with Mericle and only passed out during his second term of employment; ¶'s 28-29; ¶ 30, at times Plaintiff would be able to continue to work when he had a headache, but not on June 3, 2004; ¶ 31, Plaintiff would get an upset stomach from his headaches but never vomited; ¶'s 32-36; ¶ 37, on June 3, 2004, Plaintiff passed out and hit his head on the backhoe, the ER doctor told him he had a seizure; ¶'s 38-43; ¶ 44, Plaintiff's face was black and blue and his tongue was swollen due to having passed out and hitting his head on the backhoe; ¶ 45, Plaintiff did not have another seizure after June 3, but still had headaches; ¶ 46, on June 7, 2004, Dr. Weinberger signed a note indicating that Plaintiff could return to work on June 7 limited to light duty (Doc. 41, Ex. 3); ¶ 48, Plaintiff thought that light duty probably included running a backhoe; ¶ 49; ¶ 50, during work the week of June 7, 2004, Plaintiff had no concerns about becoming dizzy while operating a backhoe; ¶ 51;  ¶ 52, Plaintiff saw a neurologist on June 7, 2004; ¶ 53, Plaintiff gave all of his doctor's excuses to Mericle, including the June 7, 2004 light duty note of Dr. Weinberger to Joe Powles; ¶ 55; ¶ 56, there is no evidence that anyone contacted PennDOT about Plaintiff's June 3, 2004 incident; ¶ 57, and Plaintiff continued to have headaches after June 3;[6] ¶ 59; ¶ 60, Plaintiff left work early on June 10, 2004 to see Dr. Weinberger; ¶ 61, there is nothing in the record to show that anyone at Mericle objected to Plaintiff's early departure from work on June 10; ¶ 62, Plaintiff attended time trials at Pocono Raceway on June 11,2004, and felt like garbage this weekend; ¶'s 63-64; ¶ 65, on June 14, 2004, Plaintiff left a voice message on Joe Powles's phone to call off sick due to his headache (Doc. 33, Ex. 1, NT 87-88); ¶ 66, Plaintiff testified that when he called off sick

---

[6]As to ¶ 58, we agree with Plaintiff that his exhibits, Doc. Exs. 1-2, indicate that Plaintiff indeed had a seizure on June 3 and that his doctor ordered tests regarding a seizure diagnosis.

on June 14, he did not have any days left (*Id.*, NT 89).  Rothery testified that at this time, Plaintiff

had one discretionary day left (Doc. 33, Ex. 2, NT 40-41) ; ¶ 67, Plaintiff attended the race at

Pocono Raceway on June 13, 2004, Sunday, but he felt like garbage; ¶ 68, Rothery called Plaintiff

on June 14, 2004, around 4:30 to 4:45 p.m. and terminated his employment; ¶ 69, Rothery told

Plaintiff he was terminated because he missed too much time in June 2004; ¶ 70, Plaintiff testified

that during the week of June 7, 2004 he was standing around at work, taking it easy, but he wanted

to be in the backhoe but a supervisor would not  let him (Doc, 33, Ex. 1, NT 82-83); ¶ 71; ¶ 74;

¶ 75, Plaintiff testified that he believed he received Mericle's Employee Guide but also stated that

he really did not know if he got one (*Id.*, NT 107, 127)[7]; ¶ 77, Plaintiff could at times work through

his headaches when they were not severe, not when they were bad; ¶ 80, Plaintiff stated that he

never heard of anyone at Mericle speak badly about his June 3 incident, but was sure that they all

laughed about his termination (*Id.*, NT 117-118);  ¶'s 81-83; ¶ 90; ¶ 97, according to Defendants'

records, Plaintiff took as vacation days Friday January 12, March 12, May 14, 2004 (Doc. 27, Ex.

10).

    Plaintiff disputes ¶'s 91-104 of Defendants' SMF.  Thus, we shall not accept these paragraphs

of Defendants' SMF as undisputed.

## V.  Discussion.

    Defendants Mericle and Rothery move for summary judgment with respect to the Plaintiff's

Amended Complaint.  As stated, Plaintiff raises three claims, Count I, under the ADA, Count II, the

---

[7]Since it is not clear if Plaintiff in fact received a copy of the Mericle Employee Guide, we
shall not consider Defendants' Exhibit Doc. 28, which is a copy of the Guide.

FMLA, and Count III, the PHRA.[8]  Defendants argue that Plaintiff has failed to establish a genuine

issue of material fact with respect to his claims under the stated statutes.[9]

Plaintiff filed his Amended Complaint on November 21, 2005 (Doc. 12), pursuant to the

ADA, 42 U.S.C. §§ 12101, *et seq.*, alleging that Defendant Mericle discriminated against him and

failed to accommodate him regarding his seizure and headaches disability, Count I.[10]  In Count II,

Plaintiff alleges that Defendant Mericle interfered with his right to take intermittent leave and

retaliated against him for taking leave in violation of the FMLA.  In his claim under the FMLA, as

relief, Plaintiff requests back pay and front pay, as well as damages for emotional distress and

humiliation.[11]

---

[8]Only Count III includes Defendant Rothery.  As noted above, this Count was misnumbered and should be Count IV.

[9]It is agreed by the parties that Plaintiff's right to sue letter from the EEOC was dated May 31, 2005.  The Plaintiff admits in his amended pleading that he has obtained a right to sue letter.  Doc. 12, ¶ 4. b.
    As stated, this Court has found that Plaintiff exhausted his administrative remedies with the PHRC prior to bringing this action in federal court, and thus, his two PHRA claims raised in his amended pleading were not dismissed.

[10]No ADA retaliation claim is alleged in Plaintiff's Amended Complaint. Doc. 12, ¶ 's 26.-28.  Thus, in this case, we shall not consider the ADA retaliation provision, 42 U.S.C. § 12203(a).  Rather, we shall consider only Plaintiff's ADA discrimination and failure to accommodate claim under 42 U.S.C. § 12112(a).

[11]In Defendants' Motion for Summary Judgment, they argue, in part, that damages for emotional distress and  humiliation are not available to Plaintiff with respect to his FMLA claims. (Doc. 38, p. 18).  In their Reply Brief, Defendants state that since Plaintiff did not address this argument in his opposition Brief, it should be deemed as unopposed.  (Doc. 44, p. 2).  We agree with Defendants and find that Plaintiff's request for damages for emotional distress and humiliation with respect to his FMLA claims should be dismissed, since the FMLA does not provide for such damages.  *See Lloyd v. Wyoming Valley Health Care System, Inc.*, 994 F. Supp. 288, 291 (M.D. Pa. 1998) ("FMLA does not provide for emotional distress damages").

In Count III, Plaintiff alleges that Defendant Mericle discriminated against him due to his stated disability and failed to accommodate him in violation of the PHRA, 43 Pa. C.S.A. §§ 951, *et seq*. Plaintiff alleges that he had a disability, that it significantly limited him in his major life functions, and that he requested a reasonable accommodation for time off for treatment but Defendant Mericle failed to provide him reasonable accommodations for his seizure and headache impairments. Plaintiff also alleges that Defendant Rothery, as HR supervisor, aided and abetted Mericle when it discriminated against him based on his disability and when it failed to provide him with a reasonable accommodation.

In Count I of his Complaint, Plaintiff asserts an ADA discrimination claim, seemingly pursuant to 42 U.S.C. § 12112(a), in which he contends that "Defendant Mericle discriminated against Plaintiff based on his disability." (Doc. 12, ¶ 27.).[12]

---

[12]Plaintiff correctly did not name Rothery as a Defendant in Count I since it has been held in our Circuit that individuals are not liable for violations of Titles I and II of the ADA. Rather, an employer is liable for violations of the ADA. *See Emerson v. Theil College*, 296 F. 3d 184 (3d Cir. 2002).
The ADA provides that:

> no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).
A covered entity is defined as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). An employer is defined as a "person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks or in the current or preceding calendar year, and any agent of such person . . ." 42 U.S.C. § 12111(5).

As stated, in Count II, Plaintiff alleges that Defendant Mericle interfered with his right to take intermittent leave and retaliated against him for taking leave in violation of the FMLA.

In Count III, Plaintiff raises a PHRA discrimination and failure to accommodate claim against Defendant Mericle, and alleges Defendant Rothery aided and abetted Mericle's disability discrimination against him.[13]

Presently ripe for disposition are the Defendants' and Plaintiff's cross-Motions for Summary Judgment.  **(Docs. 31 and 32)**.[14]

### 1. ADA Claim

The ADA prohibits discrimination "against a **qualified individual with a disability** because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). (emphasis added).  It is the Plaintiff's position that he was terminated from his employment as a laborer with Mericle due to his disability (seizure and

---

[13]As stated, in his Amended Complaint, the Plaintiff alleges that he was unlawfully discriminated against and denied reasonable accommodation due to his disability in violation of the PHRA.  (Doc. 12, ¶'s 32.-33.).  It should be noted that the parties have agreed that for present purposes, Plaintiff's claims under the PHRA are analyzed in the same manner as his claims under the ADA.  (Doc. 44, p. 1, n. 1).  We concur with this agreement of the parties. *See Thompson v. AT&T Corp.*, 371 F. Supp. 2d 661 (W. D. Pa. 2005)(ADA and PHRA are construed in similar fashion by federal courts).

[14]Defendants seeks summary judgment with respect to all of Plaintiff's claims.   Plaintiff only seeks partial summary judgment, namely with respect to his claim in Count II, that Defendant Mericle interfered with his right to take intermittent leave and retaliated against him for taking leave in violation of the FMLA.  Doc. 43, p. 3.

11

headaches) and that the reasons offered by the Defendant for his dismissal are a pretext for discrimination.  He also alleged a cause of action for failure to accommodate under §12112(a) of the ADA.  (Doc. 12, Count I, ¶'s 26.-28.).  As noted, Plaintiff did not assert a cause of action for retaliation under 42 U.S.C. § 12203(a) of the ADA.

There are three steps in the analysis of pretext discrimination cases.  *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the Plaintiff must establish a *prima facie* case of discrimination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  Upon such a showing by the Plaintiff, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse decision.  *Id*.  Once the Defendant satisfies this burden, the burden of proof falls back onto the Plaintiff to show, by a preponderance of the evidence, that the Defendant's explanation is a mere pretext for discrimination.  *Id*.

Defendants argue that Plaintiff has not established a *prima facie* case under the ADA since he has not produced evidence that he is a "qualified individual with a disability."  Plaintiff contends that he had a disability of which Mericle was aware and that he was substantially limited in his major life activities.

The Court in *Bjorklund v. Phila. Housing Auth.*, 118 Fed. Appx. 624, 625-626 (3d Cir. 2004), stated that Plaintiff must prove the following elements in an ADA action:

> (1) he [plaintiff] was a qualified individual with a disability or who was regarded as having a disability; [FN1] and (2) that he suffered an adverse employment action as a result of his disability or perceived disability.  *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 511-12 (3d Cir. 2001); *see also Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002).

12

The ADA defines a "qualified individual with a disability" as

> an individual with a disability who, with or without
> reasonable accommodation, can perform the
> essential functions of the employment position that
> individual holds or desires.

42 U.S.C. § 12111(8).

In order for a Plaintiff to establish a discrimination claim under the ADA, he must show that he was a "qualified individual with a disability" at the time the adverse employment actions were taken. *Bjorklund, supra.* Plaintiff seeks both prospective and retrospective relief since he requests both back pay and front pay. (Doc. 12, ¶'s 26.-28.). The prospective relief that Plaintiff seeks is front pay. The retrospective relief that Plaintiff seeks also involves damages. In order to maintain a claim for retrospective relief under the ADA for Mericle's allegedly discriminatory acts, Plaintiff must establish that he was a "qualified individual with a disability" during the applicable time. *Felix v. N.Y. City Transit Auth.*, 154 F.Supp. 2d 640, 652 (S.D. N.Y. 2001). In order to maintain a claim that he is entitled to prospective relief, Plaintiff must establish that he is presently a "qualified individual with a disability."

We again note that Plaintiff's amended pleading does not raise a claim under the ADA retaliation provision, 42 U.S.C. § 12203(a); rather, it raises an ADA discrimination claim under 42 U.S.C. § 12112(a) and a failure to accommodate claim.

### A.  Prima facie case

A Plaintiff establishes a *prima facie* case under the ADA by demonstrating: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) he has suffered

13

an adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies*, 134

F.3d 576, 580 (3d Cir. 1998), *citing Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).[15]

Under the ADA, as the *Thompson* Court stated, a person has a disability if:

> The ADA defines the term "qualified person with a disability"
> as follows:
>
>> The term "qualified individual with a disability" means
>> an individual with a disability who, with or without
>> reasonable accommodation, can perform the essential
>> functions of the employment position that such individual
>> holds or desires. For the purposes of this subchapter,
>> consideration shall be given to the employer's judgment as
>> to what functions of a job are essential, and if an employer
>> has prepared a written description before advertising or
>> interviewing applicants for the job, this description shall
>> be considered evidence of the essential functions of
>> the job.
>
> 42 U.S.C. § 12112(8). 42 U.S.C. § 12102(2) sets forth three possible
> definitions of disability for purposes of the ADA: "The term
> 'disability' means, with respect to an individual  - - (A) a physical
> or mental impairment that substantially limits one or more of
> the major life activities of such individual; (B) a record of such an
> impairment; or (C) being regarded as having such an impairment."

371 F. Supp. 2d at 671-672 (Citation omitted).

Defendants argue that even if Plaintiff had an impairment as a result of having passed out

at work on June 3, 2004, and having headaches once every two weeks, there is no evidence that

he had any major life activity that has been substantially limited. (Doc. 38, p. 8). In his amended

pleading, Plaintiff alleges that he is "significantly limited in the major life functions of, including but

---

[15]Defendants correctly state the elements of a *prima facie* case of discrimination under
the ADA in their Brief. Doc. 38, p. 8.

not limited to, caring for oneself, concentrating, thinking, remembering, and working." (Doc. 12,

¶ 24.).

The Court in *Strayer v. New Enterprise Stone & Lime Co., Inc.*, 2006 WL 2773479, *4-*5

(W.D. Pa.), stated as follows:

> [P]laintiffs claiming a physical impairment under the ADA must
> demonstrate "[a]ny physiological disorder, or condition, cosmetic
> disfigurement, or anatomical loss affecting one or more of the
> following body systems: neurological, musculoskeletal, special
> sense organs; respiratory (including speech organs), cardiovascular,
> reproductive, digestive, genito-urinary, hemic and lymphatic, skin,
> and endocrine[.]" 29 C.F.R. § 1630.2(h)(1).  The major life
> activities that the impairment must substantially limit are defined
> as "functions such as caring for oneself, performing manual tasks,
> walking, seeing, hearing, speaking, breathing, learning, and working."
> 29 C.F.R. § 1630.2(i).  Such an activity is "substantially limited" if
> the individual is "[u]nable to perform a major life activity that the
> average person in the general population can perform," or if she
> is "[s]ignificantly restricted as to the condition, manner or duration
> under which [the] individual can perform a particular major life
> activity as compared to the condition, manner, or duration
> under which the average person in the general population can perform
> that same major life activity."  29 C.F.R. § 1630.2(J)(1)(i)-(ii).
>
> The following factors should be considered in determining
> whether an individual is substantially limited in a major life activity:
> (i) the nature and severity of the impairment; (ii) the duration
> or expected duration of the impairment; and (iii) the permanent
> or long term impact, or the expected permanent or long
> term impact of or resulting from the impairment.
> 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Defendants contend that the evidence does not show that  Plaintiff was substantially limited

in a major life activity.  Plaintiff argues that Defendant Mericle regarded him as disabled since it

viewed him as unable to perform his duties as a laborer.  (Doc. 41, p. 12).  Plaintiff points to his

deposition testimony, in which he stated that one of his supervisors, Brian, after his June 3, 2004

incident of passing out, would not allow him to operate the backhoe when he returned to work the week of June 7, 2004.   Plaintiff also argues that he was substantially limited in a major life activity, since when he had a headache every two weeks, he had to lie on his couch and his fiancé had to take care of him.

    We agree with Plaintiff that, based on the evidence, he has an impairment, namely his recurring headaches and one-time seizure.  Plaintiff stated that he had headaches every two weeks. (Doc. 42. Ex. 1. NT 101).  Plaintiff stated that when he had a headache, he would lie down on the couch for about  2 or 3 hours and he would take Tylenol or Advil.  (*Id.*, NT 64).  When Plaintiff experienced  a headache while working at Mericle, he would  "tell Brian I had a headache ... . He would give me Tylenol or Advil he would have in his lunch box ... " (*Id.,* NT 66).  Plaintiff would then continue to work.  Plaintiff's only symptoms with the headache were sensitivity to light and loud noises.  Sometimes he would get sick to his stomach but he would no throw up.  (*Id.*, NT 67). Prior to June 3, Plaintiff did not talk  to his doctor, Dr. Weinberger, about his headaches.  (*Id.* NT 68).  On June 7, 2004, Dr. Weinberger wrote a note allowing Plaintiff to return to work limited to light duty only until he had a follow-up with this doctor and a neurologist.  (Doc. 41, Ex. 3). Plaintiff went back to work at Mericle on June 7 and was able to operate  the backhoe.  The only limitations of which Plaintiff was aware he could not do were bending over, twisting and strenuous work like shoveling.   (Doc. 42. Ex. 1. NT 73-76).   After June 7, Plaintiff had a follow-up appointment with Dr. Weinberger and one appointment with a neurologist.  Plaintiff stated that the neurologist wanted him to return, but he could not, since he lost his  job and his insurance.  (*Id.*, NT 77, 95).

When Plaintiff returned to work afer his one-time seizure, he gave Dr. Weinberger's note to Joe Powles. Nobody ever notified PennDOT about Plaintiff's seizure, and it never had any effect on Plaintiff's driver's license. However, after the seizure, Plaintiff, voluntarily did not drive for three (3) months. (*Id*. NT 78-80). Plaintiff has not had any seizures after the June 3 incident. (*Id.*, NT 81). When he returned to work on June 7, 2004, Plaintiff wanted to operate the backhoe and did so for about one hour, but then Brian would not let him "in case something happens." (*Id.*, NT 82-83). The rest of the week, Plaintiff basically did nothing except stand around and take it easy. Plaintiff left work early on Thursday June 10 to see Dr. Weinberger, and an EKG was performed. Plaintiff had Friday, June 11, previously scheduled off to go to the Pocono Race Time Trials. He also had planned to go to the race at the Poconos that weekend. Plaintiff did, in fact, go to the time trials and the race. (*Id*. NT 83-85).

During the race weekend, Plaintiff felt like "garbage," *i.e.* flu-like symptoms and headaches, due to the medication he was taking. (*Id*. NT 86-87). Plaintiff then called in sick on Monday June 14, 2004, since he had a headache. He called Joe Powles, one of his supervisors, and left a message on his answering machine. (*Id.*, NT 87-88). At that time, Plaintiff had one discretionary day left. Defendant Rothery called Plaintiff about 4:30 p.m. on June 14 and terminated his employment for missing too much time in June 2004. (*Id.*, NT 90-92). As stated, Plaintiff was able to go to the time trials on Friday June 11, and the Race at Long Pond over the June 12-13 weekend, despite his headaches all day Saturday and Sunday. (*Id.*, NT 90-91).

We find that Plaintiff did indeed have an impairment, *i.e.* June 3, 2004 seizure and recurring headaches thereafter of every two weeks, but we find that he did not have a disability that

17

substantially limited a major life activity.  As the *Strayer* Court stated,

> [T]here is a difference between a disability and an impairment.
> In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139,
> 144 L.Ed.2d 450 (1999), the U.S. Supreme Court stated as follows:
>
>> A "disability" exists only where an impairment "substantially
>> limits" a major life activity, not where it "might," "could," or
>> "would" be substantially limiting if mitigating measures were
>> not taken.  A person whose physical or mental impairment
>> is corrected by medication or other measures does not
>> have an impairment that presently "substantially limits" a
>> major life activity.  To be sure, a person whose physical or
>> mental impairment is corrected by mitigating measures
>> still has an impairment, but if the impairment is corrected
>> it does not "substantially limit" a major life activity.  *Sutton*,
>> 527 U.S. at 482-83, 119 S.Ct. at 2146-47, 144 L.Ed.2d at 462.

*Id*. at * 5.

The *Strayer* Court further stated,

>> "Merely having an impairment does not make one
>> disabled for purposes of the ADA.  Claimants also
>> need to demonstrate that the impairment limits a
>> major life activity."  *Toyota Motor Mfg., Ky., Inc.*,
>> 534 U.S. at 195, 122 S.Ct. at 690, 151 L.Ed.2d at
>> 629.  "To qualify as disabled, a claimant must further
>> show that the limitation on the major life activity is
>> "substantial."  *Id*.

*Id*. * 5.

Plaintiff's headaches of every two weeks without any further seizures and without any medical treatment required, even an ER visit, regardless of his lack of insurance, requiring him only to lie on his couch for a few hours, is not an impairment that limited his major life activities.  In fact, even shortly after his one-time seizure requiring an ER visit, Plaintiff was able to go to the time trials and race in the Poconos for three (3) days despite having suffered a headache throughout this time.

18

Indeed, if Plaintiff was bothered by loud noises during his headaches, it hardly seems possible that he would have been able to bear the extremely loud and constant noises of the race car engines for three (3) consecutive days.

We agree with Defendants (Doc. 38, p. 11) that the record simply does not contain sufficient evidence that Plaintiff's periodic headaches with the one-time seizure is a disability recognizable under the ADA.

As the Court in *Strayer* indicated, as Defendants recognize (*Id*.), our inquiry now must focus as follows:

> Having found that [plaintiff] did not raise a genuine issue of material fact regarding whether he is disabled under 42 U.S.C. § 12102(2)(A), the Court must now assess whether [plaintiff] raised a genuine issue of material fact regarding whether he is statutorily disabled due to either a record of a substantially impaired major life activity or from Defendant regarding him as having such an impairment. 42 U.S.C. § 12102(2)(B)-(C).

*Id*. at *7.

We agree with Defendants, as discussed above, that Plaintiff did not produce evidence that he had a record of a disabling impairment. (*Id*.). Plaintiff's sparse visits to Dr. Weinberger and his one-time neurological evaluation do not show a record of a substantially impaired major life activity. Nor does the fact that when Plaintiff had a headache, he had to lie on his couch and have his fiancé take care of him, show the requisite impaired major life activity. Thus, the issue is whether Plaintiff has produced sufficient evidence to permit a reasonable factfinder to conclude that Mericle regarded him as disabled pursuant to 42 U.S.C. § 12102(2)(C). *Id*.

Plaintiff argues that Mericle regarded him as disabled and unable to perform his duties as a laborer based on his supervisor's (Brian's) directive on June 7, 2004, that Plaintiff could not operate the backhoe in case something happened.  (Doc. 41, p. 12).   Plaintiff also states that Mericle had a record of his medical condition and knew that he had suffered a seizure at work on June 3, just eleven (11) days before he was terminated.   Plaintiff also states that Mericle was aware that after his seizure, the ER doctor prescribed him Dilantin, 100 mg. 3 times per day, and that he was treated by Dr. Weinberger and a neurologist for seizures.  (*Id.*, p. 13).

The Court in *Strayer* stated:

> In *Sutton v. United Airlines*, the U.S. Supreme Court explained the contours of this inquiry:
>
> > Subsection (C) provides that having a disability includes "being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." § 12102(2)(A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.  In both cases, it is necessary that a covered entity entertain misperceptions about the individual - - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.
> > *Sutton v. United Airlines*, 527 U.S. 471, 489, 119 S.Ct. 2139, 2149-50, 144 L.Ed.2d 450, 466-67 (1999).

*Id.*

We agree with Defendants (Doc. 38, p. 12) that Plaintiff's stated evidence is not enough to show that Mericle regarded Plaintiff as disabled under § 12102(2)(C).  Just because Mericle was aware that Plaintiff had one seizure while at work on June 3, 2004, and knew that he periodically had headaches that did not require him to leave work but only required him to take an over-the-counter pain medication, does not show that Mericle considered him as disabled under the ADA. Plaintiff did not treat with Dr. Weinberger for headaches prior to June 3 and treated with him after June 3 only minimally, maybe on June 7 and June 10.  Plaintiff saw the neurologist only one time, but claims that this doctor wanted to see him again.  However, Plaintiff states that he was not able to go due to the loss of his health insurance upon his termination from Mericle.  We do not find any evidence that Mericle perceived Plaintiff's impairment as restricting one or more of his major life activities.  Despite Plaintiff's supervisor not allowing Plaintiff to continue to operate the backhoe on June 7, and despite the fact that Plaintiff basically stood around the rest of this week while at work (three full days and one half day), these limitations were shortly after the June 3 seizure, and there is no evidence that they were permanent restrictions on Plaintiff.  Further, in the past, Plaintiff testified that he had always worked through his headaches while at Mericle.  The evidence only shows that Mericle was allowing Plaintiff to take it easy at a time soon after his seizure.  Plaintiff remained at work for three full days during the week of June 7, and left early on June 10 to see Dr. Weinberger and was off on June 11 to attend the Pocono Race time trials.

Plaintiff himself felt he could operate the backhoe on June 7, and do some work.  Plaintiff's doctor cleared him for work on June 7, restricting him to light duty.  Plaintiff was never reported by Mericle or by his doctors to PennDOT as having suffered a seizure and as having a medical

21

condition which would make it unsafe for him to return to driving.  Plaintiff voluntarily did not drive

for about three (3) months, but his driver's license was never suspended or revoked.  There is no

evidence that Mericle ever requested Plaintiff to undergo a medical exam to see if he could still

perform his duties.  Plaintiff stated that the only time during the past year of the date of his

deposition that he got a headache that compelled him to stop what he was doing and go home was

when he had to wait for 1 ½ hours at Cooper's Restaurant and his head started to hurt, and he

went home without eating.   (Doc. 26, Ex. 1, NT 128).

The *Strayer* Court stated:

> In the context of work as a major life activity, the ADA requires
> a greater degree of impairment than the inability to perform
> specific duties.  The "tasks unique to any particular job are not
> necessarily important parts of most people's lives." *Toyota Motor
> Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 201, 122 S.Ct. 681, 693,
> 151 L.Ed.2d 615, 633 (2002).  Thus, "occupation-specific tasks
> may have only limited relevance" in deciding whether an
> employer regards its employee as disabled under the ADA. *Id*.

*Id*. at * 9.

We find that Plaintiff has failed to show a genuine issue of material fact as to whether

Mericle regarded him as disabled.  Since we find that Plaintiff suffers no disability under any

provision of the ADA, we shall grant Defendants' Summary Judgment Motion with respect to

Plaintiff's Counts I (ADA) & III (PHRA).[16]   Since we have found that Plaintiff did not establish  the

---

[16]As noted above, and agreed by the parties, Plaintiff's PHRA claims are analyzed in the
same manner as his  ADA claims.  *See Taylor v. Phoenixville School Dist*., 184 F. 3d 296, 306
(3d Cir. 1999).  Thus, as Defendants assert (Doc. 38, pp. 14-15), Plaintiff's PHRA claims , Count
III, as against Mericle and Rothery, should also fail for the same reasons as his ADA claims fail.
Because there is no other claim against Defendant Rothery, we shall enter judgment in her favor
and against Plaintiff with respect to this case.

first element of a *prima facie* case of discrimination under the ADA, we shall not consider the remaining two elements.

## 2. FMLA Claims

As mentioned, in Count II, Plaintiff alleges that Defendant Mericle interfered with his right to take intermittent leave and retaliated against him for taking leave in violation of the FMLA.  The FMLA, 29 U.S.C. §§ 2601, *et seq.*, requires employers to allow an employee to take unpaid leave to care for his serious health condition and prohibits retaliation by employer for doing so.[17] Specifically, Plaintiff asserts that Mericle interfered with his right to take intermittent leave when he called off work sick on June 14, 2004, in violation of 29 U.S.C. § 2615(a)(1), after suffering a seizure at work only eleven (11) days earlier, and that Mericle retaliated against him for taking FMLA leave on June 14 when it terminated his employment, in violation of 29 U.S.C. § 2615(a)(2).

Both parties seek summary judgment with respect to Plaintiff's FMLA claim, Count II.  We shall deny the Summary Judgment Motions of both Plaintiff and Defendants since we find genuine issues of disputed material facts as to the FMLA claims .  We find the record replete with disputes of material facts which prevent the granting of either Plaintiff's or Defendants' Summary Judgment Motions with respect to Count II.

As stated above, the record shows that while Plaintiff did not have any sick days left on June 14, 2004, he still had one discretionary day remaining which could be used for any purpose.  Also, we agree with Plaintiff that he did indicate that he was calling off sick on June 14 due to a

---

[17]Plaintiff's FMLA claim relates to the self-care provision of the Act, as opposed to the family-care provision, since it is based on the seizure he had while at work and his periodic headaches.

headache, and that he was, in fact, requesting time off for his medical condition.  (Doc. 41, p. 7).
We also agree with Plaintiff that since this illness was only eleven (11) days after his seizure at work
where he passed out and had to be taken by ambulance to the Hazleton General Hospital,
Defendants were well aware that his June 14th illness and his reason for calling off was most likely
related to his recent seizure.  We find, as detailed above, that there are material facts in dispute as
to whether Plaintiff was entitled to invoke his 12 weeks of FMLA leave on June 14 and whether
Defendants properly terminated him due to excessive absences from work during June 2004.  We
also find factual disputes as to whether Plaintiff was terminated  in retaliation for his taking sick
leave on June 14, 2004.

Plaintiff called in and left a voice message on Joe Powles's phone on the morning of June
14, 2004, since he had a headache and wanted the day off to cure it.  Plaintiff did not specifically
mention he was requesting FMLA leave in his phone message.  Nor is there evidence that Plaintiff
told Rothery that he was requesting FMLA leave when she called him about 4:30 p.m. on June 14
to tell him that his employment with Mericle was terminated.

As this Court stated in *Reid-Falcone v. Luzerne County Comm. College*, 2005 WL 1527792,
*3-*4, M.D. Pa.:

> "The Family and Medical Leave Act, which was designed to 'balance
> the demands of the workplace with the needs of families,' empowers
> employees to take reasonable leave from work for medical reasons
> without fear of reprisal." *Settle v. S.W. Rodgers Co., Inc.*, 998 F.Supp.
> 657, 663 (E.D.Va. 1998).  The FMLA establishes work-setting
> entitlements protected by enforcement provisions that make actionable
> not only the wrongful denial of the entitlements, but also conduct
> that is intended to discriminate or punish workers who exercise
> FMLA-guaranteed rights.  As explained in *Hodgens v. General
> Dynamics Corp.*, 144 F.3d 151, 159-60 (1st Cir. 1998):

24

The FMLA contains two distinct types of provisions. First, it creates a series of substantive rights. Eligible employees "shall be entitled" to up to twelve weeks of unpaid leave per year for any one of the following purposes: when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position." 29 U.S.C. § 2612(a)(1)(D); to care for a close family member with such a condition, 29 U.S.C. § 2612(a)(1)(C); or because of the birth, adoption, or placement in foster care of a child, 29 U.S.C. § 2612(a)(1)(A) & (B). Following a qualified absence, the employee is entitled to return to the same position or an alterative position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority. 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100(c) (1997) . . .

These rights are essentially prescriptive, "set[ting] substantive floors" for conduct by employers, and creating "entitlements" for employees. As to these rights, therefore, the employee need not show that the employer treated other employees less favorably and an employer may not defend its interference with the FMLA's substantive rights on the ground that it treats all employees equally poorly without discriminating. *Id.* at 712. In such cases, the employer's subjective intent is not relevant. The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA - - for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.

In addition to creating the above entitlements, the FMLA provides protection in the event an employee is discriminated against for exercising those rights. 29 U.S.C. § 2615(a) & (2); 29 C.F.R. § 825.220 (1997). In particular, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave." 29 C.F.R. § 825.220(c). Nor may employers "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions." 29 C.F.R. § 825.220(c). For any such violation, the employer is subject to a claim for compensatory damages and, unless the court finds the violation occurred in good faith, additional liquidated damages. 29 U.S.C. §

25

2617(a)(1)(A).  These provisions are essentially proscriptive.

The *Reid-Falcone* Court also stated:

> The Department of Labor has promulgated regulations to
> implement the entitlements and substantive safeguards
> created by the legislation.  "The regulations make it the
> employer's responsibility to tell the employee that an
> absence will be considered FMLA leave." *Ragsdale v.
> Wolverine World Wide, Inc.*, 535 U.S. 81, 87, 122 S.Ct.
> 1155, 152 L.Ed.2d 167 (2002) (citing 29 C.F.R. § 825.208(a)
> (2001)).  "Under the regulations, the employer must
> communicate with employees regarding their rights under
> the FMLA, providing individualized notice to employees
> regarding their FMLA rights and obligations." *Fogleman v.
> Greater Hazleton Health Alliance*, 122 Fed.Appx. 581, 587
> (3d Cir. 2004).  The employer also has the responsibility of
> informing the employee of her right to reinstatement to
> the same or equivalent position upon return from leave.
> *Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135,
> 142 (3d Cir. 2004) (citing 29 C.F.R. § 825.301(b)(1)(vii)).
> A violation of the regulations may constitute interference
> with the exercise of FMLA rights.  *Id.*  (citing 29 C.F.R.
> § 825.220(b)).  Moreover, employers may not manipulate
> a leave system to avoid responsibilities under the FMLA.
> *Id.*  Furthermore, "'[e]mployees cannot waive, nor may
> employers induce employees to waive their rights under
> FMLA." *Id.* (quoting 29 C.F.R. § 825.220(d)).

*Id*. at *4.

Further, the *Reid-Falcone* Court explained:

> Courts have recognized two types of claims emanating
> from the FMLA statutory and regulatory framework.  *See
> Bearley v. Friendly Ice Cream Corp.*, 322 F.Supp.2d 563,
> 570-71 (M.D. Pa. 2004).  *Parker v. Hanhemann Univ.
> Hospital*, 234 F.Supp.2d 478, 485, 487-88 (D.N.J. 2002).
> "First, a plaintiff may pursue recovery under an "entitlement
> or 'interference' theory." *Weisman v. Buckingham Tp.*,
> No. Civ. A. 04-CV-4719, 20056 WL 1406026, at *4
> (E.D. Pa. June 14, 2005).  Such a theory is based on 29 U.S.C.

> § 2615(a)(1), which proscribes interference with or denial of
> an employee's FMLA rights. *Id.* "The second type of
> recovery under the FMLA is the retaliation theory. *Id.*
> "This claim arises under 29 U.S.C. § 2615(a)(2), which
> makes it unlawful for an employer to discriminate against
> an employee who has taken FMLA leave." *Bearley*, 322
> F.Supp.2d at 571.

*Id*. at * 5.

As in *Reid-Falcone*, our Plaintiff asserts both types of FMLA claims.  Plaintiff alleges Mericle interfered with his right to take FMLA leave when he called of sick on June 14 due to his headache. Plaintiff also alleges that Mericle retaliated against him for taking his FMLA leave when it terminated him on June 14 for excessive absenteeism during June 2004.

Defendants argue that Plaintiff was not entitled to leave under the FMLA and that he did not give Mericle notice of his intention to take FMLA leave.  Defendants contend that Plaintiff did not have a serious health condition and that he did not connect his sick call on June 14 to a previous or outstanding illness, injury or health condition.  We agree with Plaintiff that, since he had a seizure at work only eleven (11) days before his sick call of June 14, and since Mericle was well aware of his seizure and had the documents regarding his follow up care, such as Dr. Weinberger's June 7 note restricting Plaintiff to light duty work and notice of Plaintiff's June 10 doctor's appointment, that Mericle could be found to be cognizant that Plaintiff was seeking time off on June 14 for a serious health condition which may have qualified for FMLA leave.

We also agree with Plaintiff that, for present purposes, there is enough evidence that he had a period of incapacity following  his seizure of more than three (3) consecutive calendar days and treatment of two or more times by Dr. Weinberger, a neurologist, and an EKG on June 11.  In

27

addition to the June 11 EKG, Plaintiff testified that he had a headache June 12, 13 and 14.  He felt like "garbage" during the weekend of June 12 and 13, despite attending the Pocono Race.  We agree with Plaintiff (Doc. 43, p. 2) that he has sufficiently shown that he was being treated by Dr. Weinberger from June 4 through the time he was terminated.  He was restricted from work June 3 through June 7, when Dr. Weinberger allowed him to return to work on light duty.[18]  Notwithstanding the fact that he had only one visit to see a neurologist, Plaintiff testified that he could not seek further treatment with the neurologist, who Plaintiff stated wanted to see him again, since he lost his health insurance when he was terminated by Mericle.  We find that, under these circumstances, there was sufficient information known to Mericle for it to be reasonably apprised that Plaintiff was requesting time off on June 14 for a serious health condition, *i.e.* his seizure at work only eleven (11) days earlier.[19]  But for the fact that Plaintiff's seizure was only eleven (11) days before he called off sick, and but for the fact that Mericle knew Plaintiff was being medically treated after the seizure, we would be more compelled to agree with Defendants (*Id.*, pp. 7-8) that Plaintiff's calling in sick on June 14 was not sufficient notice under the FMLA.

There is no dispute that when he called off sick on June 14, Plaintiff did not mention he was requesting leave under the FMLA.  (Doc. 26, Ex. 1, NT 127).  There is no dispute that Plaintiff had one more day of discretionary leave to use as of June 14.  There is no question that Plaintiff had a

---

[18] As stated above, Plaintiff left the hospital on June 3 AMA and was directed not to drive for a time.

[19]We disagree with Defendants  (Doc. 40, p. 6), as indicated above, that there exists no evidence that Plaintiff was diagnosed with a seizure.  Both the ER doctor and Dr. Weinberger indicated that Plaintiff had a seizure.

seizure at work on June 3, 2004, that he called off sick on June 14, eleven (11) days later, due to a headache, and that he was fired on June 14 for taking off too many days in June, especially Friday to Monday call offs.   We find sufficient evidence,  based on Plaintiff's deposition, that Plaintiff had called off sick on June 14 indicating he was suffering from a headache.   Rothery knew that on Friday June 11, Plaintiff had to have medical tests regarding his seizure, and this was after Mericle had Dr. Weinberger's June 7 light duty note.    (Doc. 26, Ex. 2, NT 46).   In fact, Plaintiff called Rothery back during the week he was terminated and told her he may have had a seizure, but Rothery did not at that point advise Plaintiff he could have taken FMLA leave and seek to rehire him. (Doc. 26, Ex. 2, NT 33-34).[20]   Further, according to Rothery's testimony:

> Q.      Sure.  John had not used even 1 day of the 12 weeks that he could have used pursuant to the FMLA Act at the time that you terminated him on June 14th, 2004?
>
> Mr. Borland:  That's the same objection.
>
> The Witness:  Correct.

By Ms. Pollick:

> Q.      Why didn't you just let John Bell have that day off because he had a health condition?

---

[20]The *Reid-Falcone* Court stated that Plaintiff does not have to prove discriminatory intent with respect to a FMLA interference claim.  Plaintiff must show that he was entitled to reinstatement and denied it.   2005 WL 1527792, *9.  There is sufficient evidence to show that Plaintiff had one unused discretionary day as of June 14 and that after his termination, Rothery had knowledge that Plaintiff could be suffering from a serious health condition entitling him to FMLA leave and reinstatement.

A.    He called off.  He never stated he was  – at that time when he called off, I did not get the message that it was relative to his condition.

Q.    Okay.  Well, how did you find out he called off?

A.    He left a message.

Q.    With who?

A.    I don't know if it [was] with me or with Joe.  But if Joe got the message then he communicated it to me and if I got the message I communicated it to Joe.

Q.    Did you call John Bell and say why are you asking for the day off?

A.    I don't recall.

Q.    Now  - -

A.    I believe he just called off sick so I didn't need to clarify why.  I mean, he just called off sick.  If it were something else  - - I don't know.

(*Id.*, Ex. 2, NT 38).

Rothery also stated:

Q.    Well, you knew 11 days earlier he had collapsed on the work site and he was taken to the hospital, correct?

A.    I knew that, correct.

Q.    And you knew he had taken time off the week before that Friday to get an EKG, correct?

A.    I don't know if it was an EKG or EEG.

Q.    Well, he took off time for a medical test, correct?

A.    He had an appointment on Friday, correct.

30

Q.      And he also took off time the day before the test to see his doctor, correct?

A.      I believe so, yes.

Q.      So although you knew that he was transported to the hospital because he collapsed at the work site, he left early to  - - for a doctor's appointment, actually went for testing the day before you terminated him, you never thought to call him and ask him why he was taking the day off?

A.      When he needed the time for those appointments we gave it to him so this did not  - - I didn't know it was related to that.

Q.      Why didn't you ask because it makes a logical conclusion?

A.      Because he called off sick.

(*Id.*, NT 39).

Rothery's testimony continued as follows:

By Ms. Pollick:

Q.      An employee does not have to use the magic words, quote, FMLA, to be given time off pursuant to the FMLA Act?

A.      Correct.

Q.      You, as an HR director, would provide an employee with 12 weeks off if it was necessary for a serious medical condition, regardless of an employee's attendance?

A.      Correct.

Q.      So John must have told you that he had a seizure because you write it on the unemployment compensation documents, correct?

A.      Correct.

31

Q.      And at no time once you found out that he had a seizure and he was having severe headaches did you reconsider your decision to terminate him, correct?

A.      Correct.

Q.      And you can't recall if you talked to anyone after you found out that he had severe headaches and a seizure?

A.      I don't know he had a seizure.  He may have mentioned it but I did not receive any documentation or anything to substantiate that.  It was something that was just said but  - -

Q.      Did you ask for any documentation?

A.      I don't remember.

Q.      Now, you  - - in the summer, the guys work 10 hour days, correct?

A.      It varies.

Q.      Is it normally 10 hours or is that the rule or the exception, just in the summer months?

A.      I don't know.  I would just say it varies.  I don't know what the norm is out there.

Q.      Did you ever hold a meeting with John Bell to discuss how you could accommodate his situation that was causing him to call off sick that Monday?

A.      I don't remember.

Q.      Did you ever tell him he had to fill out any paperwork so that Mericle would allow him 12 weeks off for an illness that was causing him to call in sick that Monday?

A.      No.

32

> Q.      What communications did you have with John Bell about
> his situation starting when you found out that he had collapsed at
> the work site?
>
> A.      What communications?
>
> Q.      Yes.  You described two of them.  Did you have any more
> communications with him?
>
> A.      I don't recall.
>
> Q.      And when was the communication that he told you that he
> believed he had a seizure and that he was having severe headaches?
> I know you said that was after your decision to terminate.  Do
> you know when?
>
> A.      It might have been prior  - - it might have been when  - -
> he was making another appointment and he was going to find
> out what had actually happened.  It was  - - just in conversation  - -
> he didn't really seem that he knew what it was and he just  - -
> it didn't seem so serious.  So I don't remember but I just remember
> saying, I don't know, you know, good luck or I don't remember.

(*Id.*, NT 43-45).

We find a factual dispute as to whether Rothery failed to adequately inform Plaintiff of his

FMLA rights, whether she and Mericle knew he had a serious condition at the time of termination

based on his seizure at work just eleven (11) days earlier, and whether Mericle should have

connected Plaintiff's June 14 call to his seizure at work just eleven (11) days earlier.  Based on these

disputed material facts, Plaintiff will be permitted to proceed on his claim that Mericle interfered

with his FMLA rights.  *See Reid-Falcone, supra* at * 6.  Moreover, since these facts are disputed, we

will not grant Plaintiff's Partial Summary Judgment Motion.

Plaintiff was not informed of his FMLA rights on June 14 or thereafter, even though there is

enough evidence to show that Mericle was aware he had a seizure at work just eleven (11) days

33

earlier.  Rothery did not advise Plaintiff of his FMLA rights even when she spoke with him after his

termination and was aware that his sick call on June 14 could have been related to his seizure.

There is enough evidence to let the factfinder determine  if Plaintiff had a sufficiently serious health

condition at the time he called off sick on June 14.  Plaintiff  was diagnosed  with a seizure at his

June 3 ER visit.  He left the hospital that day AMA.  He was directed not to drive a car for now.  He

was prescribed Dilantin.  His doctor, Dr. Weinberger, diagnosed him with seizure and indicated

that as of June 7, Plaintiff was limited to light work.  Plaintiff saw Dr. Weinberger on June 10 and

saw a neurologist during this time.  Plaintiff had a medical test performed, such as an EKG on June

11, but we do not find the result of this test   in the record.  However, as discussed above, we

disagree with Plaintiff that he is entitled to judgment as a matter of law with respect to his

interference claim under the FMLA.[21]

Plaintiff also raises a retaliation claim under the FMLA.  This Court in *Reid-Falcone* stated:

> There is some consensus among the courts, particularly Pennsylvania
> Federal District Courts, that the *McDonnell-Douglas* burden-shifting
> approach provides the appropriate analytical framework for an FMLA
> retaliation claim.  *See e.g., Vorhees v. Time Warner Cable National Div.,*
> No. Civ.A. 98-1460, 199 WL 673062, at *3 (E.D.Pa. Aug. 30, 1999);
> *Holmes v. Pizza Hut of America, Inc.,* No. Civ.A. 97-4967, 1998 WL
> 564433, at * 7 (E.D. Pa. Aug. 31, 1998) ("most courts have held
> that . . . the anti-retaliation analysis is *McDonnell's* burden-shifting
> analysis"); *Williams v. Shenango, Inc.,* 986 F.Supp. 309, 318
> (W.D. Pa. 1997).  As explained by Judge Simandle in *Parker,*
> 234 F.Supp.2d at 492 n. 14:
>
> > Under this framework, plaintiff must first establish a
> > prima facie case of discrimination by showing (1) that

---

[21]Plaintiff only seeks summary judgment with respect to his FMLA interference claim.
(Doc. 43, p. 5 & Doc. 35, p. 5).

> she took advantage of the protected right to leave under
> the FMLA, (2) that she was adversely affected by an
> employment action taken by defendants, and (3) the
> unfavorable employment action was caused by her choice
> to take the leave under the FMLA.  Then, the burden
> shifts to defendants to articulate a legitimate, non-discriminatory
> reason for the adverse employment action.  Then, plaintiff
> must show that the non-discriminatory reason given is
> really a pretext for actual discrimination.

*Id*. at *7-*8.  The *Reid-Falcone* Court also stated that Plaintiff has to prove retaliatory intent for the exercise of a protected right with respect to a FMLA retaliation claim.  2005 WL 1527792, *9.

Defendants argue that Plaintiff cannot establish the first and third elements of his *prima facie* retaliation claim since he has no evidence that he engaged in protected activity, because he never asserted to Mericle that he had a serious health condition, and he has no evidence to show a causal link between the protected activity and his termination. (Doc. 38, p. 17).

Plaintiff claims that he was entitled to leave on June 14 under the FMLA.  With respect to his retaliation claim, he has to show that Mericle's motivating factor for its decision on June 14 to terminate him was his exercise of his rights under the FMLA.  We have found disputed facts as to whether Plaintiff can be deemed as invoking a right protected by the FMLA, since he was covered by it, and Rothery conceded that if he had a serious health condition he would have been entitled to request FMLA leave.  We have found, for present purposes, that Plaintiff has sufficiently shown that he invoked his protected right under the FMLA to seek sick leave, that he was eligible for such leave, and that he had not used a single day of his 12 weeks allowed.  Plaintiff has also shown that he was adversely affected by Mericle's employment action after he sought sick leave on June 14, since he was terminated this same day.  We also find that for purposes of the present filings, Plaintiff

has established a sufficient causal link that he was retaliated against by Mericle for exercising his right under the FMLA since, as Plaintiff argues (Doc. 41, p. 9), he was terminated on the very same day that he has shown he engaged in the protected activity.  In addition to this very close temporal proximity in time between Plaintiff's calling off sick at about 5:00 a.m. and his termination at about 4:30 p.m. the same day, it is undisputed that Plaintiff still had one more discretionary day off with Mericle on June 14  that he was entitled to use for any reason.

Defendant Mericle has offered a legitimate, non-discriminatory reason for its termination of Plaintiff, namely, that he missed too much time in June 2004, especially Friday to Monday call-offs.  Plaintiff has shown that Mericle's non-discriminatory reason was a pretext for discrimination, since he was terminated within 12 hours after he called off sick and since he still had one discretionary day left to call off work for any reason.

Thus, we shall deny both Summary Judgment Motions with respect to the remaining Count II, FMLA interference and retaliation claims.

An appropriate Order and Judgment  follows.


**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: February 5, 2007**